

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-15-00044-CV
No. 07-15-00045-CV

IN THE INTEREST OF B.J.H. AND J.J.G., CHILDREN

On Appeal from the County Court at Law No. 2
Randall County, Texas
Trial Court Nos. 10410-L2, 6987-L2; Honorable Jack M. Graham, Presiding

June 30, 2015

## MEMORANDUM OPINION

Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.

The mother appeals the trial court's order terminating her parental rights to her children, B.J.H. and J.J.G.[1] She argues the evidence was insufficient to prove each termination predicate ground found by the trial court as well as its finding that termination was in the best interest of B.J.H. and J.J.G. Finding sufficient evidence supports the trial court's order of termination, we will affirm.

---

[1] To protect the children's privacy, we will refer to appellant as "the mother," the children by their initials, and the father of B.J.H. as "the father." *See* TEX. FAM. CODE ANN. § 109.002(d) (West 2014); TEX. R. APP. P. 9.8 (a),(b). The final order the mother challenges on appeal also terminated the parental rights of the father, and of J.B.G., the father of J.J.G. Neither father appeals.

## Background

Appellee the Texas Department of Family and Protective Services received a report in June 2013, that the father had physically abused his stepson, six-year-old J.J.G. The mother, it believed, negligently supervised the children and failed to intervene in an abusive situation. The investigation revealed J.J.G. was bruised from his shoulders to his calves. In the opinion of a sheriff's department investigator, J.J.G. displayed "very significant, well-developed, well-defined bruising." J.J.G. told the investigator the father caused the injuries by spanking him with a belt. The investigator testified the mother down-played the injuries and attributed the cause to someone else. The father, however, admitted causing the injuries to J.J.G. He disciplined the child for lying and told the investigator "it got totally out of control."

The mother testified when her mother learned of welts on J.J.G.'s back a family disagreement ensued. It escalated and involved the mother's brothers. The mother allowed the father to leave with B.J.H. and J.J.G, taking "them from the chaos." The lead investigator for the sheriff's department believed the mother and the father hid J.J.G.

The Department removed J.J.G. and three-year-old B.J.H from the home of the mother and the father and filed a suit affecting the parent-child relationship on behalf of each child. It sought, among other things, protection, conservatorship, and termination of the parent-child relationship. The trial court appointed the Department temporary managing conservator of each child. The children were initially placed with relatives and later moved to a Department foster home. By the time of trial, the children were placed with their maternal grandmother.

As a result of the occurrence, the father was indicted for the felony offense of injury to a child.[2] He plead guilty and was placed on deferred adjudication community supervision for seven years. For her role in the occurrence, the mother was charged with tampering with or fabricating physical evidence.[3] After her guilty plea, she was placed on five years' deferred adjudication community supervision and assessed a fine of $1,000.

Orders rendered after the adversary hearings in the Department's cases specified the services required for the mother to obtain the children's return. The case was tried to the bench on December 17, 2014. Through final orders signed January 16, 2015, the trial court terminated the parent-child relationship between the mother and B.J.H. and J.J.G and appointed the Department the children's permanent managing conservator. Termination in each case was based on a best interest finding and findings of predicate grounds (D), (E), (F), (L) & (O).[4]

Analysis

By her first issue the mother argues each predicate ground for termination found by the trial court lacks the support of legally and factually sufficient evidence.

Termination of parental rights under Family Code section 161.001 requires proof by clear and convincing evidence that the parent committed one of the acts or omissions listed in section 161.001(1)(A)—(T) and that termination is in the best interest

---

[2] *See* TEX. PENAL CODE ANN. § 22.04 (West Supp. 2014).

[3] *See* TEX. PENAL CODE ANN. § 37.09 (West Supp. 2014).

[4] *See* TEX. FAM. CODE ANN. § 161.001(1)(D), (E), (F), (L) & (O) and (2) (West 2014).

of the child. TEX. FAM. CODE ANN. § 161.001(1),(2) (West 2014); *In re A.V.,* 113 S.W.3d 355, 362 (Tex. 2003). Clear and convincing evidence is the degree of proof that produces in the mind of the factfinder a firm belief or conviction of the truth of the allegations to be proved. *In re C.H.,* 89 S.W.3d 17, 25 (Tex. 2002).

Under the legal sufficiency analysis, we examine all of the evidence in the light most favorable to the challenged finding, assuming the "factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *In re J.F.C.,* 96 S.W.3d 256, 266 (Tex. 2002). We disregard all contrary evidence the factfinder could have reasonably disbelieved or found incredible. *Id.* However, we take into account undisputed facts that do not support the finding, so as not to "skew the analysis of whether there is clear and convincing evidence." *Id.* If the record presents credibility issues, we defer to the factfinder's determinations provided they are not unreasonable. *In re J.P.B.,* 180 S.W.3d 570, 573 (Tex. 2005).

For the factual sufficiency analysis, we examine the entire record determining whether "the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction" as to the challenged finding. *In re J.F.C.,* 96 S.W.3d at 266. If the evidence that could not be credited in favor of the finding is so great that it would prevent a reasonable factfinder from forming a firm belief or conviction that either of the statutory requirements has been met, the evidence is factually insufficient and the termination will be reversed. *Id.*

4

Only one predicate finding under section 161.001(1) is necessary to support an order of termination when there is also a finding that termination is in a child's best interest. *In re A.V.,* 113 S.W.3d 355, 362 (Tex. 2003); *In re T.N.,* 180 S.W.3d 376, 384 (Tex. App.—Amarillo 2005, no pet.). Therefore, we will affirm the termination order if the evidence is both legally and factually sufficient to support any statutory ground on which the trial court relied in terminating parental rights, and the best interest finding. *In re E.A.G.,* 373 S.W.3d 129, 141 (Tex. App.—San Antonio 2012, pet. denied).

Subsection (1)(E) requires proof the parent, "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[.]" TEX. FAM. CODE ANN. § 161.001(1)(E) (West 2014).

"Endanger" means exposure "to loss or injury; to jeopardize." *In re M.C.,* 917 S.W.2d 268, 269 (Tex. 1996) (per curiam). In general, "conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *In re R.W.,* 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). While "endanger means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *Texas Dep't of Human Servs. v. Boyd,* 727 S.W.2d 531, 533 (Tex. 1987). A child is endangered when the environment creates a potential for danger of which the parent is aware but disregards. *In re S.M.L.,* 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Endangerment can be exhibited by both actions and failures to act. *In re U.P.,* 105 S.W.3d 222, 233 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).

The relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *See In re J.T.G.,* 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); TEX. FAM. CODE ANN. § 161.001(1)(E) (West 2014). The specific danger to the child's well-being may be inferred from parental misconduct standing alone. *Boyd,* 727 S.W.2d at 533; *In re R.W.,* 129 S.W.3d at 738). Termination under subsection (E) may not be based on a single act or omission but instead requires proof the parent engaged in a voluntary, deliberate, and conscious course of conduct. *In re E.P.C.,* 381 S.W.3d 670, 683 (Tex. App.—Fort Worth 2012, no pet.); *In re M.C.T.,* 250 S.W.3d 161, 169 (Tex. App.—Fort Worth 2008, no pet.) The factfinder may infer from evidence of past endangering conduct that similar conduct will recur if the child is returned to the parent. *In re M.M.,* No. 02-08-00029-CV, 2008 Tex. App. LEXIS 9237, at *17 (Tex. App.—Fort Worth Dec. 11, 2008, no pet.) (mem. op.). To determine whether a relevant course of conduct was established, a court may consider evidence of a parent's endangering conduct after the child's removal by the Department. *In re C.A.B.,* 289 S.W.3d 874, 883 (Tex. App.—Houston [14th Dist.] 2009, no pet.).

Illegal drug use of a parent or caregiver and domestic violence often endanger children. *See In re J.T.G.,* 121 S.W.3d at 125 ("Parental and caregiver illegal drug use and drug-related criminal activity likewise supports the conclusion that the children's surroundings endanger their physical or emotional well-being"); *In re J.W.,* No. 02-08-00211-CV, 2009 Tex. App. LEXIS 2145, at *11 (Tex. App.—Fort Worth Mar. 26, 2009, no pet.) (mem. op.) ("A parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, supports a

6

finding that the parent engaged in conduct that endangered the child's physical or emotional well-being"); *In re S.K.A.,* 236 S.W.3d 875, 901 (Tex. App.—Texarkana 2007) ("Continued narcotic use after the children's removal is conduct that jeopardizes parental rights and may be considered as establishing an endangering course of conduct"), *pet. denied,* 260 S.W.3d 463 (Tex. 2008) (per curiam); *In re D.T.M.,* No. 11-14-00245-CV, 2015 Tex. App. LEXIS 4401, at *4 (Tex. App.—Eastland Apr. 30, 2015, n.p.h.) (mem. op.) (citing *In re J.O.A.,* 283 S.W.3d 336, 345 (Tex. 2009) and *In re C.J.O.,* 325 S.W.3d 261, 266 (Tex. App.—Eastland 2010, pet. denied)) (drug use and domestic violence may constitute evidence of endangerment).

The Department caseworker testified the mother's continued drug use was the primary factor preventing reunification with the children. The mother testified she used methamphetamine in October, August, and June 2014 and an unspecified date a year earlier. She claimed to have previously gone four or five years without using. Other evidence showed her use of drugs during earlier years. She was indicted in July 2009 for possessing methamphetamine and endangering J.J.G. by using the drug in his presence. She plead guilty to the charges and received three years' deferred adjudication community supervision. Other evidence showed the mother tested positive for amphetamine and methamphetamine in a June 2013 analysis and positive for amphetamine, methamphetamine, and "marijuana metabolites" in an October 2013 assessment. The record also indicates that when the trial court extended the proceedings' dismissal dates six months in June 2014, a Department caseworker "made very, very clear" to the mother she could choose methamphetamine or her children. As noted, the mother acknowledged in her testimony she used methamphetamine in

October 2014, a fact confirmed by a positive analysis on October 27, 2014, for methamphetamine and marijuana. A counselor for B.J.H. recommended ceasing visitation with the mother until she passed drug testing and presented herself as stable. Visitation thus ended in October 2014.

The Department caseworker agreed the mother had "several" negative drug tests following the children's removal. The mother also testified that on the Monday preceding trial a probation-required drug test was negative.

Even if the trial court accepted the mother's contention she had not engaged in illegal drug use for a long period before her children were removed in June 2013, her significant drug use since the removal cannot be ignored. The trial court was free to take it into account when evaluating her child-endangering conduct. *See In re J.W.,* 2009 Tex. App. LEXIS 2145, at *11.

Besides the mother's illegal drug use, domestic violence was shown. According to the testimony of a counselor for the children, when the mother was "mad" she hit B.J.H. in the face. Removal of the children followed the father's injury of J.J.G. A February 2014 indictment charged that in December 2013 the mother "harbor[ed] or conceal[ed]" the father when she knew he was charged with injury to a child. The mother plead guilty to the charge and received a sentence of three years' deferred adjudication community supervision. During much of the pendency of the termination case the mother remained in relationship or contact with the father and was the victim of domestic violence at his hands. The mother testified she moved from the home but was twice assaulted by the father during August 2014 and once during December 2014.

She sought medical attention following two of these episodes. The Department introduced photographs depicting bruising about the mother's face which she testified was the result of the August and December 2014 assaults by the father.

Evidence of the father's conduct also weighs on the endangering determination. *See In re A.B.,* 125 S.W.3d 769, 776-77 (Tex. App.—Texarkana 2003, pet. denied). (under subsection (E) focus is on a course of conduct by either the parent or person with whom the parent placed the children).

A counselor who saw the mother for six sessions during 2013 testified the mother told her that the case began when family members reported the father "had beat her son from head to toe." As noted, he plead guilty to the offense of injury to a child. According to a plea-bargain agreement, the father plead guilty to theft in February 2014 and was sentenced to ninety-days' confinement in the county jail. Enhancement paragraphs in the indictment charged the father was convicted of burglary of a habitation in 2003, and assault against a public servant in 2007. The father described for a testifying psychologist a pattern of methamphetamine use, when he was not incarcerated, which was "fairly continuous and on a daily basis." According to the father's probation officer, on November 25, 2014, he admitted using methamphetamine the previous day. The officer testified the father had been charged with the August 2014 assault of the mother, and that the father admitted a physical altercation with the mother in December 2014. The officer agreed that the father is a "violent individual." Concerning the father's plan of services, the Department caseworker testified he did not maintain housing or stable employment due to multiple, lengthy periods of incarceration in the county jail. The caseworker believed the father had not demonstrated an ability to

provide a safe environment for B.J.H. because of continued drug use and acts of domestic violence against the mother.

When viewed in the light most favorable to a finding of endangerment as well as in light of the entire record, we find a reasonable factfinder could have formed a firm belief or conviction that the mother knowingly placed B.J.H. and J.J.G. in an endangering condition when she left them in the care of the father after J.J.G.'s assault at the father's hands; engaged in an endangering course of conduct by using illegal drugs, both before the children's removal and during the pendency of the termination suit; and engaged in a continuing course of endangering conduct through participation in an ongoing abusive relationship with the father. Accordingly, the evidence was legally and factually sufficient to support the subsection (E) endangerment finding for termination of the mother's parental rights to her two children.[5] *See* Tex. Fam. Code Ann. § 161.001(1)(E) (West 2014).

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.,* 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2014). The best interest analysis evaluates the best interest of the child, not the parent. *In re A.C.B.,* 198 S.W.3d 294, 298 (Tex. App.—Amarillo 2006, no pet.). In examining the best interest of the child, we may consider evidence that was also probative of the predicate act or omission. *In re C.H.,* 89 S.W.3d at 28.

---

[5] Having determined the record contains evidence sufficient to sustain the subsection (E) ground, we need not address the evidence supporting remaining predicate grounds found by the court.

The following factors may be considered in determining the best interest of the child: (A) the desires of the child; (B) the emotional and physical needs of the child now and in the future; (C) the emotional and physical danger to the child now and in the future; (D) the parental abilities of the individuals seeking custody; (E) the programs available to assist these individuals to promote the best interest of the child; (F) the plans for the child by these individuals or by the agency seeking custody; (G) the stability of the home or proposed placement; (H) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (I) any excuse for the acts or omissions of the parent. *Holley v. Adams,* 544 S.W.2d at 371-72.

The *Holley* factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *In re C.H.,* 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.* The evidence supporting the statutory predicate grounds for termination may also be used to support a finding that the best interest of the children warrants termination of the parent-child relationship. *In re C.H.,* 89 S.W.3d at 28.

With regard to the best interest finding, B.J.H. told her counselor she wanted to live at her grandmother's house. J.J.G. told his counselor he preferred being with his grandmother if he could not be at home. The counselor observed an improvement in J.J.G.'s behaviors following his move from foster care to his grandmother's home.

When told that visitation with the mother would end, J.J.G. responded, "That's fine. I hate CPS. I don't want to go to that building anyway." On cross-examination the counselor explained J.J.G. has feelings of guilt "that all of this is his fault." As recently as October 2014, J.J.G. admitted to his counselor that he did not trust anyone and had no plans to trust anyone.

The counselor agreed on questioning by the children's attorney ad litem that the children receive "stability, structure, and guidance" in the grandmother's home. She believed adoption would be "a very positive thing" for the children.

A Department worker responsible for observing visitation testified on "more than a few" occasions she had to intervene in the visit because the mother's behavior or the children's behavior was "out of control." She then qualified her response by adding that only once was intervention required because of the mother's behavior. Overall she felt the visits were not productive.

J.J.G. has been removed or moved six times, four occasions in the present case and twice in a prior case. The Department's caseworker saw termination as in the best interest of the children because it would give them permanency.

The evidence of the mother's past conduct indicates her inability to provide a safe, stable, and permanent home environment for her children. She testified of changed behavior including church membership. But it remains that her history is one of serious drug usage, criminal conduct and participation in an abusive relationship. And the trial court could have seen the testimony regarding her son's attitudes as

12

demonstrating the consequences in his life of the home environment he had experienced.

The record does not show adequate parenting skills by the mother. According to the testimony of her evaluating psychologist, she has a history of involvement with men who place her and the children at risk. He elaborated, "[S]o a whole series of men who had criminal backgrounds, who had been abusive to her, who had drug abuse histories or were actually using drugs. In one case, a man who was a registered sex offender."

In 2008, the mother's use of methamphetamine produced a positive drug-test result in J.J.G. A hair sample taken from the mother shortly after the father's abuse of J.J.G. proved positive for methamphetamine, justifying an inference that she used the substance while caring for the children. She testified of seeking a divorce but on cross-examination acknowledged she was in the company of the father when her petition was filed and could not deny "laughing and joking" with him at the time.

There was evidence contrary to the best interest finding. The mother testified she rented a house about two months before trial. She was employed with the Veterans of Foreign Wars in a position that "pa[id] [her] bills." The Department made available to the mother several programs for her assistance and the best interest of the children. And she performed many of the services offered for reunification. But the trial court could have seen her use of methamphetamine about two months prior to trial to underscore her inability to benefit from the assistance provided.

After viewing all of the evidence in the light most favorable to the best interest finding, we conclude the evidence was sufficiently clear and convincing that a

reasonable fact finder could have formed a firm belief or conviction that termination of the parent-child relationship between the mother and B.J.H. and J.J.G. was in the children's best interest. We further conclude that, viewed in light of the entire record, any disputed evidence could have been reconciled in favor of the trial court's best interest finding or was not so significant as to preclude the trial court from reasonably forming a firm belief or conviction that termination was in their best interest. Thus, the evidence was legally and factually sufficient to support the trial court's best interest finding. We overrule the mother's second issue.

Conclusion

Having overruled the mother's two issues, we affirm the order of the trial court.


James T. Campbell
Justice

14